1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITE THE PARKS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, et al.<br><br>Defendants. | No.  1:21-cv-00518-DAD-HBK<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DENYING DEFENDANTS' MOTION TO STRIKE<br><br>(Doc. Nos. 9, 17) |

18   This matter is before the court on a motion for preliminary injunction brought by plaintiffs

19 Unite the Parks, Sequoia ForestKeeper, and Earth Island Institute (collectively, "plaintiffs") and a

20 motion strike filed by defendants United States Forest Service and United States Fish and

21 Wildlife Service (collectively, "defendants").  A hearing on the motions was held on May 18,

22 2021.  Attorneys Deborah Ann Sivas and René Voss and certified law students Sidni M.

23 Frederick and Catherine H. Rocchi appeared by video for plaintiffs along with client

24 representatives Deanna Wulff and Dr. Joseph Werne.  United States Department of Justice Trial

25 Attorneys Bridget K. McNeil and John Tustin appeared by video on behalf of defendants.

26   Having reviewed the parties' briefing and heard oral argument, and for the reasons

27 explained below, plaintiffs' motion for a preliminary injunction (Doc. No. 9) will be denied and

28 defendants' motion to strike (Doc. No. 17) will also be denied.

1

# BACKGROUND

Plaintiffs allege the following in their complaint and in their motion for preliminary injunction.  The Southern Sierra Nevada Pacific fisher ("SSN fisher") is a medium-sized carnivorous mammal that is part of a geographically isolated and genetically unique population of the Pacific fisher (*Pekania pennanti*) living in the dense, old growth forests of the southern Sierra Nevada Mountains.  (Doc. Nos. 1 at ¶¶ 2, 41; 9-6 at ¶¶ 11–12.)

While the Pacific fisher once inhabited the West Coast from British Columbia to Southern California, today the SSN fisher is on the brink of extinction.  (*Id.* at ¶ 2.)  Scientists using habitat-based models have estimated that there were only 100 to 500 SSN fishers remaining as of 2012.  (*Id.* at ¶¶ 2, 40–42.)  Since those estimates were developed, the suitable SSN fisher denning and resting habitat, which is necessary for SSN fisher reproduction, has been further reduced in the Sierra and Sequoia National Forests by more than 50 percent due to prolonged drought and subsequent tree mortality from drought stress and native beetles; significant wildfires, including two large wildfires in 2020; or by being destroyed or degraded into "non-habitat" by logging and vegetation management activities by the United States Forest Service ("USFS").  (*Id.* at ¶¶ 2, 41.)  Plaintiffs state that these changes to the SSN fisher habitat have imperiled the species' long-term prospects for survival.  (*Id.* at ¶¶ 2, 41, 62.)

The United States Fish and Wildlife Service ("FWS"), along with other scientific studies, have reported that suitable "high-value" denning and resting habitat is critical for the SSN fishers' survival.  (*Id.* at ¶ 46.)  This necessary habitat is found in "low- to mid-elevation coniferous and mixed conifer and hardwood forests with characteristics of mid- and late-successional forests, including diverse successional stages, moderate to dense forest canopies, large-diameter trees, coarse downed wood, and singular features of large snags, tree cavities, and deformed trees."  (*Id.*)

Fishers use cavities in live trees, in "snags" (standing dead or dying trees), or in logs (downed trees) in which to give birth and raise their young.  (Doc. No. 9-5 at 15.)  The SSN fisher denning season generally runs from March 1 through June 30, during which USFS implements a Limited Operating Period where vegetation management activities are prohibited.  (Doc. No. 1 at

¶ 67.)  Denning females need access to multiple trees across their range because the females move the kits—young fishers—to numerous den locations before they are weaned and kits are not mobile for approximately four months.  (*Id.* at ¶¶ 17, 67.)  Juvenile fishers then travel with their mother in her home range until they disperse into their own ranges at about one year of age.  (*Id.* at ¶ 94.)

Although fishers need a high proportion of snags, down wood, and other old-growth features for successful reproduction, they do not create their own cavities to use as dens.  Rather the "cavities in live trees, snags, and down logs used as reproductive dens (natal and maternal) and rest sites are a result of heartwood decay." (Doc. No. 9-1 at 23.)  The cavities in large live and dead trees that provide the "high-value" denning or resting habitat may take decades or centuries to develop.  (Doc. No. 1 at ¶ 46.)  Given the SSN fishers' small population size, successful reproduction and dispersal of juvenile fishers are critical to the species' long-term survival and recovery.  (*Id.* at ¶ 94.)

**B.    The Listing of SSN Fishers as Endangered and Relevant Administrative History**

Starting in 1990, concerned conservation organizations and members of the public began petitioning FWS to list Pacific fishers under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*.  (*Id.* at ¶¶ 43–56.)  After years of litigation, on May 15, 2020, the FWS eventually listed the SSN fisher (referred to therein as a "West Coast fisher") as endangered under the ESA for this distinct population segment, a status that is reserved for a species "in danger of extinction throughout all or a significant portion of its range" and is the most protective status available under the ESA.  (*Id.* at ¶¶ 1, 6, 20, 54.)

In the listing process, FWS indicated that the principal threats to SSN fisher survival were "habitat loss from wildfire and vegetation management; toxicants (including anticoagulant rodenticides); and the cumulative and synergist effects of these and other stressors acting on small populations."  (*Id.* at ¶¶ 44, 54–56.)  FWS also cited researchers who identified the greatest long-term threats as the isolation or fragmentation of small populations and "the higher risk of

/////

/////

3

extinction due to stochastic[1] events."  (*Id.* at ¶ 44.)  FWS described the SSN fisher as vulnerable to rapid decline in their numbers and localized extinction due to vulnerabilities specific to their small population size, such as the following:

> (1) loss of large contiguous areas of historical habitat, including a 39 percent loss of its habitat over the past five years, in combination with restriction of the species to forested habitats that have been lost or modified due to timber-harvest practices, large, high-severity wildfires whose frequency and intensity are in turn influenced by the effects of climate change, and increasing forest fuel density from fire suppression and a lack of low-severity fire over the recent long term;
>
> (2) dependence on specific elements of forest structure that may be limited on the landscape, including microsites for denning and resting; and
>
> (3) susceptibility to injury or mortality due to predation from co-occurring larger predators.

(*Id.* at ¶ 56.)  FWS also has separately stated that "the most critical limiting factor for fishers is the availability of suitable habitat elements to provide for successful reproduction and rest sites." (*Id.* at ¶¶ 46, 62.)

> 1.   ESA Administrative History

The listing of the SSN fisher as endangered on May 15, 2020 required USFS to engage in consultation with FWS for all projects that may affect the species.  (*Id.* at ¶ 57.)  Thus, on May 19, 2020, USFS initiated consultation with FWS and provided a Programmatic Biological Assessment for 40 already-approve logging and vegetation management projects.  (*Id.*)

A few weeks later, FWS issued a Programmatic Biological Opinion ("2020 PBO") and an Incidental Take Statement, which provided authorization to proceed on all forty initial USFS projects, authorized incidental take on five of those projects, and permitted USFS to take twelve fishers during that period, including four adult females and eight fisher kits.  (*Id.* at ¶¶ 65, 85–92.) The 2020 PBO acknowledges that new SSN fisher population estimates were not conducted, and that the SSN fisher population estimates being relied upon were created prior to the 2012-2015 drought and subsequent tree and habitat loss.  (*Id.* at ¶ 66.)  Additionally, the projects allowing

---

[1]  Stochastic events are random fluctuations in the biological or physical environment, such as predation or disease; or wildfire, drought events, and/or flooding, respectively.  (*Id*. at ¶¶ 54–56.)

1   incidental take were authorized to occur during the Limited Operating Period, when such

2   vegetation management activities are normally prohibited.  (*Id.* at ¶ 67.)  Approximately six

3   weeks later, FWS issued a second addendum authorizing another five projects under the 2020

4   PBO, bringing the total number of USFS projects authorized through concurrence or consultation

5   with FWS to forty-five.  (*Id.* at ¶ 57.)

6        After the 2020 PBO was issued and the forty-five USFS projects were approved, the

7   Creek Fire ignited in the summer of 2020, burning approximately 379,895 acres in the Sierra

8   National Forest.  (*Id.* at ¶ 69.)  The Sequoia Complex Fire (also known as the SQF Complex Fire

9   or Castle Fire) also ignited that summer, burning approximately 174,178 Acres in the Sequoia

10  National Forest and Sequoia National Park.  (*Id.* at ¶ 70.)  These two fires also destroyed tens of

11  thousands of acres of SSN fisher habitat, including critical denning, resting, and foraging habitat.

12  (*Id.* at ¶¶ 69–70.)  Five of the seven previously-identified "core" habitat areas, which are habitats

13  scientists had determined were needed to conserve the SSN fisher, were also destroyed in the

14  2020 fires along with some of the six "linkage" areas that connect the seven core habitats,

15  potentially inhibiting or reducing fisher movement between those core habitats.  (*Id.* at ¶¶ 71–72.)

16       After the two major fires in the summer of 2020, plaintiffs sent a notice declaring their

17  intent to pursue a citizen suit under ESA § 1540(g) if defendants did not reinitiate consultation

18  with respect to the forty-five proposed projects "in light of dramatic wildfire-caused landscape

19  changes to SSN fisher habitat that were not previously considered in the 2020 PBO."  (*Id.* at

20  ¶ 73.)  Thereafter, on February 23, 2021, USFS issued an "Amendment to the Programmatic

21  Biological Assessment for the Southern Sierra Nevada DPS of Pacific Fisher" ("2021 PBA"),

22  which analyzed the potential effects of the recent fires on the fisher habitat.  (*Id.* at ¶ 74.)  On

23  February 24, 2021, USFS sent a letter asking FWS to "reinitiate consultation to update the

24  baseline existing conditions in order to address changes resulting from the two wildfires that

25  occurred within the [SSN fisher habitat] during the 2020 fire season."  (*Id.* at ¶ 75.)

26       On March 12, 2021, in response to USFS's request to reinitiate ESA consultation, FWS

27  issued a second Programmatic Biological Opinion ("2021 PBO") which acknowledged many

28  ongoing threats to the SSN fisher but nonetheless determined that the USFS's activities involved

1    with the forty-five projects were unlikely to jeopardize the continued existence of the species or

2    appreciably reduce the likelihood of its recovery.  (*Id.* at ¶¶ 76–84; Doc. No. 9-1 at 9.)

3              2.        National Environmental Policy Act History

4              The forty-five proposed projects identified in plaintiffs' complaint were approved at

5    different times and subject to different levels of National Environmental Policy Act ("NEPA")

6    review.  (Doc. No. 1 at ¶ 96.)

7              Plaintiffs assert that FWS prepared a relevant environmental impact statement ("EIS")

8    with a cumulative effects analysis as a part of the 2004 Sierra Nevada Forest Plan Amendments

9    ("2004 Framework"), which they state is a regional plan that "contains vegetation management

10   standards and guidelines, including specific standards for SSN fisher habitat management."  (Doc.

11   No. 21 at 16–17.)  The 2004 Framework has been amended three times, in 2007, 2010, and 2013.

12   (*Id.* at 17.)

13   **C.       The Claims Brought**

14             Plaintiffs filed their complaint in this action on March 26, 2021 asserting the following

15   claims:  (1) an alleged violation of ESA section 7(a)(2), its implementing regulations, and the

16   procedural requirements of the Administrative Procedure Act ("APA"), by defendant FWS in

17   connection with the issuance of the 2020 Programmatic Biological Opinion/Incidental Take

18   Statement and the amended 2021 Programmatic Biological Opinion (Doc. No. 1 at 35–36); (2) an

19   alleged violation of ESA section 7(a)(2) and 7(d) against defendant USFS for failing, following

20   the 2020 wildfires, to reinitiate programmatic consultation on its ongoing and proposed projects

21   throughout the Sierra and Sequoia National Forests that "adequately and meaningfully evaluates

22   both the survival and recovery of the species based on credible science and current data

23   concerning population size and viability" (*id.* at 36–37), and (3) an alleged violation of NEPA

24   against defendant USFS due to its failure to prepare a supplemental cumulative impacts analysis

25   (*id.* at 37–38).

26   /////

27   /////

28   /////

Plaintiffs filed their motion for preliminary injunction on April 26, 2021, seeking an injunction staying thirty-one of the forty-five proposed projects identified in their complaint.[2] (Doc. No. 9.)  On May 4, 2021, defendants filed an opposition to plaintiffs' motion for preliminary injunction (Doc. Nos. 13–16, 18) and a motion to strike certain of plaintiffs' expert reports (Doc. No. 17).  Plaintiffs filed their reply in support of their motion for preliminary injunction (Doc. No. 21) and opposition to defendants' motion to strike (Doc. No. 20) on May 11, 2021.  Defendants filed their reply in support of their motion to strike on May 13, 2021.  (Doc. No. 22.)

## LEGAL STANDARDS

### A.     Motion for Preliminary Injunction

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*,

/////

/////

/////

/////

---

[2]  Plaintiffs had reduced the number of projects they sought to enjoin to thirty-one after defendants disclosed the status of each of the forty-five projects in their opposition to plaintiffs' motion for preliminary injunction.  (Doc. No. 21 at 5 n.1.)

537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by Winter*, 555 U.S. 7.[3] The party seeking the injunction bears the burden of proof as to each of these elements.  *See Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

**B.     Administrative Procedure Act**

Compliance with the ESA and NEPA is reviewed under the APA.  5 U.S.C. §§ 701–706; *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012); *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007).

"The APA sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, __U.S.__, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks and citation omitted).  Only "final agency actions" are reviewable under the APA.  5 U.S.C. § 704; *see also id.* § 701 (for purposes of the APA's judicial review provisions, "agency action" has "the meaning[] given" by § 551).  An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id.* § 551(13). Under § 706 of the APA, the court is "to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Regents*, 140 S. Ct. at 1905 (internal quotation marks and citation omitted).

The APA "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious."  *Regents*, 140 S. Ct. at 1905

---

[3]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

1   (internal citations and quotation marks omitted).  An agency's "determination in an area

2   involving a 'high level of technical expertise'" is to be afforded deference.  *McNair*, 537 F.3d at

3   993 (citing 5 U.S.C. § 706(2)(A)).  The district court's role "is simply to ensure that the [agency]

4   made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'"  *Id.*

5   (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see also Earth Island Institute*

6   *v. Carlton*, 626 F.3d 462, 472 (9th Cir. 2010).  "Factual determinations must be supported by

7   substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection

8   between facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains*

9   *Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations

10  omitted).

> 11   This requires the court to ensure that the agency has not, for
> 12   instance, "relied on factors which Congress has not intended it to
>      consider, entirely failed to consider an important aspect of the
>      problem, offered an explanation for its decision that runs counter to
> 13   the evidence before the agency, or [an explanation that] is so
>      implausible that it could not be ascribed to a difference in view or
> 14   the product of agency expertise."

15  *McNair*, 537 F.3d at 987 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

16  *Co.*, 463 U.S. 29, 43 (1983)); *see also Friends of Santa Clara River v. U.S. Army Corps of*

17  *Engineers*, 887 F.3d 906, 920 (9th Cir. 2018).

18                              **STATUTORY AND REGULATORY SCHEMES**

19  **A.      Endangered Species Act**

20         The ESA was enacted with the goal of providing "a means whereby the ecosystems upon

21  which endangered species and threatened species depend may be conserved," *Nw. Ecosystem All.*,

22  475 F.3d at 1144 (citing 16 U.S.C. § 1531), and with the recognition that all wildlife have

23  "esthetic, ecological, educational, historical, recreational, and scientific value."  16 U.S.C.

24  § 1531(a)(3).  The ESA authorizes the Secretary of the Interior, which has delegated this

25  responsibility to FWS, "to declare species of animal life 'endangered' and to identify the 'critical

26  habitat' of these creatures."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 159–60 (1978).

27  Conservation of an endangered species means "to use and the use of all methods and procedures

28  which are necessary to bring any endangered species . . . to the point at which the measures

1   provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).  "The plain

2   intent of Congress in enacting this statute was to halt and reverse the trend toward species

3   extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184.

4          Section 7(a)(1) of the ESA directs all federal agencies to "utilize their authorities in

5   furtherance of the purposes of [the ESA] by carrying out programs for the conservation of [listed]

6   species." 16 U.S.C. § 1536(a)(1).  To carry out this obligation, an agency must engage in

7   consultation with FWS before undertaking any action that may have direct or indirect effects on

8   listed species in order to evaluate the impact of the proposed action.  16 U.S.C. § 1536(a).

9          As part of this consultation, FWS must analyze whether the proposed action will reduce

10  the likelihood of recovery of the species or its survival and then prepare a biological opinion.  50

11  C.F.R. § 402.02; *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 387 F.3d 968, 1070

12  (9th Cir. 2004); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 933 (9th Cir.

13  2008).  A biological opinion "is the document that states the opinion of [FWS] as to whether or

14  not the Federal action is likely to jeopardize the continued existence of listed species or result in

15  the destruction or adverse modification of critical habitat."  50 CFR § 402.02(d).  When preparing

16  a biological opinion, FWS must:  (1) "review all relevant information;" (2) "evaluate the current

17  status of the listed species;" and (3) "evaluate the effects of the action and cumulative effects on

18  the listed species or critical habitat." 50 C.F.R. § 402.14(g).  FWS is required to "use the best

19  scientific . . . data available" while evaluating the effects of the proposed action on species.

20  16 U.S.C. § 1536(a)(2).

21         An agency is required to reinitiate consultation with FWS "[i]f new information reveals

22  effects of the action that may affect listed species or critical habitat in a manner or to an extent not

23  previously considered," or "the identified action is subsequently modified in a manner that causes

24  an effect to the listed species . . . that was not considered in this programmatic biological

25  opinion."  50 C.F.R. § 402.16(a)(2)–(3).  While any legally required consultation is pending, the

26  ESA requires agencies to hold their actions in abeyance until that consultation is complete.

27  16 U.S.C. § 1536(d).  Agencies are prohibited from making "any irreversible or irretrievable

28  commitment of resources with respect to the agency action which has the effect of foreclosing the

1   formulation or implementation of any reasonable and prudent alternative measures which would

2   not violate [section 7] (a)(2)."  (*Id.*)  "This prohibition . . . continues until the requirements of

3   section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

4   **A.      National Environmental Policy Act**

5          "[R]ecognizing the profound impact of man's activity on the interrelations of all

6   components of the natural environment," Congress enacted NEPA in 1969.  42 U.S.C. § 4331.

7   NEPA established the Council of Environmental Quality, which interprets the Act by

8   "promulgat[ing] regulations to guide federal agencies in determining what actions are subject to

9   that statutory requirement."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40

10  C.F.R. § 1500.3).  NEPA requires an agency to "provide full and fair discussion of significant

11  environmental impacts,"  40 C.F.R. § 1502.1, and to prepare an EIS for "major Federal actions

12  significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  Among

13  other specifications, an EIS details the environmental impact of the proposed action, any

14  unavoidable adverse environmental effects, and alternatives to the proposed action.  *Id.*  NEPA

15  imposes procedural rather than substantive requirements.  *Robertson v. Methow Valley Citizens

16  Council*, 490 U.S. 332, 350 (1989); *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 777 (9th

17  Cir. 2019).  So long as "the adverse environmental effects of the proposed action are adequately

18  identified and evaluated, the agency is not constrained by NEPA from deciding that other values

19  outweigh the environmental costs."  *Robertson*, 490 U.S. at 350; *see also Conner v. Burford*, 848

20  F.2d 1441, 1450 (9th Cir. 1988) ("NEPA does not require that mitigation measures completely

21  compensate for the adverse environmental effects"); *Japanese Village, LLC v. Federal Transit

22  Admin.*, 843 F.3d 445, 455 (9th Cir. 2016).

23         Agencies are required to prepare supplemental environmental reviews when "[t]here are

24  significant new circumstances or information relevant to environmental concerns and bearing on

25  the proposed action or its impacts."  40 C.F.R. § 1502.9(d)(1)(ii).

26  /////

27  /////

28  /////

11

1

**ANALYSIS**

2          Before turning to plaintiffs' motion for preliminary injunction, the court will first address

3   defendants' motion to strike certain aspects of plaintiffs' submissions in support of that motion.

4   **A.       Motion to Strike**

5          Defendants seek to strike (Doc. No. 17) the following:  (1) portions of plaintiffs'

6   memorandum of points and authorities (Doc. No. 9-1 at 17:13–23, 18:1–3, 18:25–28, 19:1–4, and

7   19:8–13), (2) portions of the Declaration of Chad Hanson (Doc. No. 9-3 at ¶¶ 9–13, 16–38, and

8   Exs. A, C, & D);  (3) portions of the Declaration of Deanna Wulff (Doc. No. 9-7 at ¶¶ 10–31 and

9   Exs. A–M); (4) portions of plaintiffs' reply brief (Doc. No. 21 at 8:3–11 and footnote 6); and (5)

10  the Declaration of Dr. Joseph Werne in its entirety (Doc. No. 9-6).  (Doc. No. 17.)  In the

11  alternative, defendants argue that if the court considers the challenged aspects of plaintiffs'

12  submission it should equally consider the rebuttal declarations filed by defendants:  the

13  Declaration of Richard Kuyper (Doc. No. 15) and the Declaration of Marc Meyer (Doc. No. 16).

14         At the outset, the court notes that

15              [t]he purpose of a preliminary injunction is merely to preserve the
                relative positions of the parties until a trial on the merits can be
16              held.  Given this limited purpose, and given the haste that is often
                necessary if those positions are to be preserved, a preliminary
17              injunction is customarily granted on the basis of procedures that are
                less formal and evidence that is less complete than in a trial on the
18              merits.

19  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  When considering a motion for

20  preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits

21  submitted by the parties.  *Lane v. CitiMortgage, Inc.*, No. 2:14-cv-02295-KJM, 2014 WL

22  6670648, at *3 (E.D. Cal. Nov. 21, 2014) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th

23  Cir.2009) ("A district court may . . . consider hearsay in deciding whether to issue a preliminary

24  injunction.").  "Such evidence need not conform to the standards for a summary judgment

25  motion. . . . And the weight to be given such evidence is a matter for the court's discretion, upon

26  consideration of the competence, personal knowledge and credibility of the affiant.'"  *Id.* (internal

27  citations and quotation marks omitted).

28  /////

1    At a high level, defendants seek to strike portions of the reports plaintiffs have submitted

2  in attempting to critique the agencies' decisions, which defendants assert is improper because the

3  court may not rely upon extra-record or post-decisional evidence to determine the correctness of

4  an agency decision.  (Doc. No. 17-1 at 2.)  Defendants assert that were the court to do so it would

5  violate the APA record review rule since plaintiffs have failed to meet any of the available

6  exceptions allowing the introduction of outside evidence.  Defendants further assert the Werne

7  Declaration improperly opines on the ultimate merits of this action under the law.  (*Id.* at 4.)

8    Plaintiffs respond that the declarations submitted in support of their motion are being

9  relied upon to establish their standing and to show irreparable harm as required to support the

10  issuance of the preliminary injunction sought and/or to demonstrate legal defects in the PBOs,

11  such as the alleged failure to review the best available science regarding the impacts of large

12  wildfires on the SSN fisher habitat.  (Doc. No. 20 at 3–6, 8, 10.)  Plaintiffs also assert that the

13  declarations they have submitted are admissible under the relevant factors exception of the APA

14  record review rule.  (*Id.*)

15    In their reply, defendants again assert that certain declarations submitted by plaintiffs do

16  not meet the APA relevant facts exceptions and again urge that if the court were to consider

17  plaintiffs' declarations, it should consider defendants' rebuttal declarations.  (Doc. No. 22.)

18  Defendants also suggest that during the agency's reinitiation of consultation on the 2020 PBO, it

19  did in fact consider some of the materials plaintiffs now submit to the court, such as the two

20  letters attached as exhibits to the Second Voss Declaration (Doc. No. 21-1), but the agency

21  determined that those letters "did not warrant adjustment of the draft revised PBO . . .."  (Doc.

22  No. 22-1 at ¶¶ 1–4.)

23    A review of defendants' briefing suggests that their motion is not truly one to strike.

24  Instead, the motion is functionally more of a supplemental opposition to plaintiffs' motion for

25  preliminary injunction, in which defendants argue that this court should limit its consideration of

26  plaintiffs' declarations to purposes defendants argue are permitted by the APA.  (Doc. No. 17-1 at

27  2).  However, consideration of extra-record materials is appropriate "if necessary to determine

28  whether the agency has considered all relevant factors and has explained its decision."  *Ctr. for*

13

1   *Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (internal

2   citations and quotation marks omitted); *see also Humane Society of U.S. v. Locke*, 626 F.3d 1040,

3   1058 (9th Cir. 2010) (same); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d

4   1443, 1450 (9th Cir. 1996) (same).  Such is the case here.  The court's purpose in enforcing

5   environmental-protection statutes such as the ESA or NEPA that impose procedural requirements

6   "is to [ensure] that the information available to the decision-maker includes an adequate

7   discussion of environmental effects and alternatives, which can sometimes be determined only by

8   looking outside the administrative record to see what the agency may have ignored." *Animal Def.*

9   *Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989);

10  *Lane v. CitiMortgage, Inc*., No. 2:14-CV-02295-KJM, 2014 WL 6670648, at *3 (E.D. Cal. Nov.

11  21, 2014) (holding that "[i]n ruling on a preliminary injunction, the court may rely on

12  declarations, affidavits, and exhibits, among other things").

13        In this suit, plaintiffs allege that defendants have failed to consider significant new

14  circumstances and information that were absent from and unaddressed in the administrative

15  record.  (Doc. No. 20 at 3–6.)  In keeping with the authorities cited above, the court is permitted

16  to consider extra-record materials, such as those offered by plaintiffs here, in determining whether

17  the agency considered all relevant factors and adequately explained its decision, as well as for the

18  purposes of attempting to establish plaintiffs' standing and irreparable harm.  Accordingly,

19  defendants' motion to strike will be denied.

20  **B.      Motion for Preliminary Injunction**

21        As noted at the outset, as the party seeking preliminary injunctive relief, plaintiffs must

22  make a sufficient showing as to all four prongs of the *Winter* test in order to be entitled to the

23  requested preliminary relief.  *All. for the Wild Rockies*, 632 F.3d at 1135.  Below, the court

24  addresses those factors and plaintiffs' showing with respect to each.

25        1.      <u>Standing</u>

26        "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the

27  threshold requirement imposed by Article III of the Constitution by alleging an actual case or

28  controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  To satisfy the case or

controversy requirement, plaintiffs must show that they have suffered an injury-in-fact that is concrete and particularized; that the injury is traceable to the challenged action of defendants; and that the injury is likely to be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004).  In a case brought pursuant to an environmental-protection statute, such as the ESA, the requisite injury for standing purposes is an injury to the plaintiff, not to the environment.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000).  An association may bring suit on its members' behalf if:  "[1] its members would have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit."  *Friends of the Earth*, 528 U.S. at 169.

Plaintiffs assert they have demonstrated standing through the declarations of each of the plaintiff representatives who have visited the forests, in which the thirty-one projects are to occur, in the past and intend to do so in the future.  (Doc. Nos. 9-1 at 9 n.1; 9-3; 9-4; 9-7; 21-2; 21-3; 21-4.)  Therein, plaintiffs state that their members have "interests in preserving the long-term integrity of [the Sierra and Sequoia National] forests" and preservation of the SSN fisher, which they assert are under threat of injury that is traceable to the proposed projects and that a favorable judicial decision in this action will prevent or redress those injuries.  (*Id.*)  Plaintiffs state they regularly visit the Sierra and Sequoia National Forests for research, recreation, and to enjoy the scenic beauty, including the sights and sounds of the SSN fisher.  (*See, e.g.*, Doc. No. 9-3 at ¶¶ 6–7.)  They also represent that they have been to the project areas and will continue to visit those areas.  (*Id.*)

Defendants argue that plaintiffs have not established Article III standing to bring their claims.  (Doc. No. 13 at 19–21.)  Defendants make several arguments in this regard, including that:  certain of plaintiffs' declarations submitted in support of the preliminary injunction do not identify an injury-in-fact from each the specific areas where the proposed projects are to be performed; those declarants' stated interests are too general; and that generalized interest in the identified national forests or the SSN fisher is not sufficient.  (*Id.*)

1    In their reply, plaintiffs respond that they have established standing because they have

2    alleged more than a generalized interest, they are challenging the programmatic decisions of the

3    agency with a particular concern for the SSN fisher, and the Ninth Circuit has held that they are

4    not required to establish a direct injury as to each of the thirty-one challenged projects.  (Doc. No.

5    21 at 5–8) (citing *Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 807 F.3d 1031,

6    1043 (9th Cir. 2015).)  Moreover, plaintiffs' representatives have supplied additional declarations

7    outlining the ways in which each of the proposed projects will cause harm to the fishers and to the

8    plaintiff organizations' research efforts, future recreation activities, and their ability to continue to

9    visit the areas where the thirty-one proposed projects are set to occur.  (*See, e.g*., Doc. Nos. 21-2,

10    21-3, 21-4.)

11    The court concludes that plaintiffs have adequately established their standing to proceed.

12    Through this action, plaintiffs seek to prevent harm to their future SSN fisher research and ability

13    to recreate and/or visit the forests.  *See Summers v. Earth Island Inst*., 555 U.S. 488, 496 (2009)

14    (a "person who has been accorded a procedural right to protect his concrete interests can assert

15    that right without meeting all the normal standards for redressability and immediacy") (citing

16    *Lujan*, 504 U.S. at 573 n.7 (1992)).  Much like in previous litigation efforts by conservation

17    organizations brought on behalf of threatened and/or endangered species, including by plaintiff

18    Earth Island on behalf of fishers in this district, plaintiffs have adequately demonstrated they

19    would suffer an injury absent court action.  *See*, *e.g*., *Earth Island Institute v. Elliott*, 290 F. Supp.

20    3d 1102, 1113 (E.D. Cal. 2017); *Earth Island Institute, et al. v. Nash, et al*., Case No. 1:19-cv-

21    01420-DAD-SAB, Order (April 21, 2021) (Doc. No. 94 at 24).  Although plaintiffs are not

22    required to establish a direct injury posed to them from each project affected by USFS's failure to

23    reinitiate ESA consultation, here they have adequately outlined the plaintiffs' potential injury at

24    each potential project with adequate specificity.  *Cottonwood Envtl. Law Ctr*., 789 F.3d at 1081–

25    82 ("Cottonwood has properly alleged that the reinitiation of consultation could result in the

26    protection of its members' interests in specific National Forests and project areas where those

27    members recreate.  [citation omitted.] Those interests are clearly within the 'zone of interests

28    protected by the [ESA].'") (quoting *Natural Resources Defense Council v. Jewell*, 749 F.3d 776,

1  783 (9th Cir. 2014) (*en banc*); *see also Salmon Spawning & Recovery Alliance v. Gutierrez*, 545

2  F.3d 1220, 1229 (9th Cir. 2008).  Thus, the court finds plaintiffs have established their standing.

3        2.    <u>Likelihood of Success on the Merits</u>

4        Plaintiffs also bear the burden of demonstrating that they are likely to succeed on the

5  merits of this action or, at the very least, that "serious questions going to the merits were raised."[4]

6  *All. for the Wild Rockies*, 632 F.3d at 1131.

7        a.    *Plaintiffs' ESA Claim Based Upon Defendants' Failure to Calculate the*

8              *Size of the Current SSN Fisher Population*

9        In their pending motion for a preliminary injunction, plaintiffs assert the 2020 and 2021

10  PBOs permitting the thirty-one proposed projects to proceed are arbitrary and capricious,

11  violating the ESA in four distinct ways.  (Doc. No. 9-1 at 23–27.)  First, plaintiffs contend that

12  FWS did not conduct or update the estimated SSN fisher population and instead relied on the

13  older, now-outdated habitat-based models from two studies referred to as Spencer et al. 2011 and

14  Zielinski et al. 2013a.  (*Id.* at 23.)  According to plaintiffs, these studies predate the significant

15  changes to the Sierra Nevada area due to bark beetle infestations, extended drought, massive

16  forest fire, and large-scale tree die-off.  (*Id.*)  Plaintiffs also take issue with the fact that the 2021

17  PBO concluded that the proposed USFS actions across the range of the SSN fisher "when added

18  to the environmental baseline and analyzed in consideration of all potential cumulative effects,

19  will not rise to the level of precluding recovery or reducing the likelihood of survival of the

20  species."  (Doc. No. 1 at ¶ 83.)  Plaintiffs assert that the 2021 PBO did not contain any new

21

22  [4]  The court notes that the manner in which plaintiffs have presented their arguments has made the
court's review rather difficult.  From the court's perspective, plaintiffs have employed a

23  scattershot approach that lacks specificity as to the administrative history of each project and is at
times vague as to the ultimate relief sought.  While the court recognizes, and is sympathetic to,

24  the fact that in bringing a motion for preliminary injunction time is of the essence, and plaintiffs
are not in the best position to know the status of each of the proposed projects they seek to enjoin,

25  the court cannot be tasked with sifting through the large record to gather the support for plaintiffs'
assertions as to each project.  It is plaintiffs' burden to demonstrate a likelihood of success on the

26  merits as to each project, by addressing each project on its own, grouping like projects, or

27  demonstrating a flaw common to all the proposed projects.  Plaintiffs have not done so, and their
nonspecific description of what has not occurred with respect to the approval of the thirty-one

28  proposed projects they now seek to enjoin is undermined by the record in many instances.

analysis of the SSN fisher population.  (*Id.* at ¶ 76.)  Plaintiffs suggest that defendants have violated the requirement that they use the best available evidence in making such a determination because defendants were aware of these obviously significant changes to the fishers' potential habitat since the last population estimate set forth in the Spencer et al. study from 2011.  (Doc. No. 9-1 at 24.)

Defendants contest plaintiffs' factual allegations.  Specifically, they note that of all the projects proposed, the USFS determined that the overwhelming majority were not likely to adversely affect the fisher.  (Doc. No. 13 at 15–16.)  As to those five projects that were likely to adversely affect the SSN fishers, the agency determined that each of the projects was not likely to jeopardize the SSN fisher's overall viability or reproductive success because they would create only a temporary disturbance in the fishers' denning and resting habitat.[5]  (*Id.* at 15.)  As to those five projects, defendants assert that

> [t]he conservation measures proposed by the USFS and included in the PBO make it reasonably *unlikely* that direct mortality of fishers will occur, and ensure that sufficient high-quality denning and foraging habitat is maintained for the species. . . .  None of the projects will remove suitable habitat, and fishers that may live in the area should be able to continue doing so during and after project implementation.

(Doc. No. 15 at ¶¶ 17–18) (emphasis added.)

Defendants also clarify that after the 2020 wildfires, USFS worked with FWS "to evaluate the fires' overlap with fisher habitat" and whether "[o]ut of an abundance of caution," they would reinitate ESA consultation at the PBO level.  (Doc. No. 13 at 16.)  In addition to this programmatic-level reinitiation of consultation, the agencies also reviewed whether any projects appended to the 2020 PBO required project-level reinitiation of ESA consultation.  (Doc. No. 18 at ¶¶ 6, 12.)  Through these processes, the agencies determined the majority of projects submitted in 2020 did not require a project-level reinitiation of consultation.  (Doc. No. 13 at 16–17.)

/////

/////

---

[5]  In those five projects, FWS authorized the incidental take of up to four female fishers and up to eight kits.  (*Id.* at 16.)

18

1        Defendants reject plaintiffs' first substantive argument challenging FWS's failure to

2    update the estimated SSN fisher population and relying on outdated habitat-based models from

3    2011 and 2013.  According to defendants, the 2021 PBO satisfies the ESA's Section 7

4    requirements and FWS did not violate the ESA's "best available science" standard with regard to

5    SSN fisher populations because there is no newer population data available.  (*Id.* at 22.)

6    Defendants take the position that FWS used the best available data and acknowledged in its PBOs

7    that there was a lack of updated population estimate.  Moreover, defendants contend, agencies are

8    not required to develop new data to satisfy this ESA requirement or to delay any forest

9    management projects until a new population estimate is prepared.  (*Id.*)  Defendants also note that

10    the 2020 PBO did look at the habitat loss caused by drought conditions from 2012 to 2015 (*see,*

11    *e.g.,* Doc. No. 9-5 at 840–43, 855–59), and the reinitiated consultation addressed the impact of the

12    2020 fires on the SSN fisher habitat in the 2021 PBO (*id.* at 933–35, 966–69).  Defendants point

13    out that the agencies then specifically reviewed whether the 2020 fires had affected any of the

14    projects plaintiffs seek to enjoin:

> 15    [T]he Forest Service[ concluded] that neither reinitiation of
> 16    consultation under the ESA nor supplementation under NEPA is
> warranted for the overwhelming majority of projects included in
> 17    batches 1 and 2 of the 2020 consultation.  The primary basis for this
> conclusion is that for most projects, neither the Creek Fire nor the
> 18    Sequoia Complex Fire overlapped the project treatment areas. . ..
> In many other instances, the fires may have impacted a project but
> 19    would not result in new effects to listed species or new and
> potentially significant impacts to the environment.  For some
> 20    projects, however, the fires had very serious effects, and for those
> projects agency staff reached a variety of conclusions: reinitiation
> 21    of consultation and/or NEPA supplementation, project suspension,
> or project cancellation.

22    (Doc. No. 18 at ¶ 13.)

23        In reply, plaintiffs reiterate their contention that during consultation, FWS must "evaluate

24    *the current status* and environmental baseline of the listed species" pursuant to 50 C.F.R.

25    § 402.14, and that was not done here.  (Doc. No. 21 at 9) (emphasis added.)  Plaintiffs further

26    assert the claimed lack of the present availability of such information is of no significance

27    because the agencies could have taken the necessary time to make those findings prior to

28    authorizing the proposed projects. (*Id.* at 10–11.)  Plaintiffs also assert for the first time that FWS

1    had access to raw data needed to prepare updated calculations and the agency's "generating [of]

2    an updated population estimate is entirely feasible."  (*Id.*)

3        Plaintiffs' argument appears to have evolved somewhat over the course of briefing on the

4    pending motion.  While initially cast as a failure to perform what they described as a duty to

5    conduct an environmental baseline, ultimately plaintiffs attempt to analogize the current situation

6    to that which was presented in *Natural Resources Defense Council v. Kempthorne*, 506 F. Supp.

7    2d 322 (E.D. Cal. 2007).  In that case, the district court found that the agency was required to

8    analyze data it had received only a week before issuing its biological opinion, reasoning that

9    "FWS could have delayed releasing the biological opinion until it had reviewed and analyzed the

10   new abundance data, which was especially significant as it showed [the endangered species']

11   abundance at its nadir."  *Id.* at 366.  The district court in *Kempthorne* concluded that an agency

12   "may not entirely fail to develop appropriate projections where data 'was available but simply not

13   analyzed.'"  *Id.* at 359.

14       In this case, however, plaintiffs have not presented the information they assert was

15   available to defendants, when that information became available, or what type of analysis

16   defendants would have been able to conduct prior to the issuance of the 2020 or 2021 PBOs.

17   Plaintiffs have thus failed to support their conclusory contention that this is a situation like that

18   presented in *Kempthorne*, where the available data merely needed to be placed into the models

19   that already existed.  Such a supporting showing is critical because the ESA makes clear that

20   agencies are not required "to conduct new tests or make decisions on data that does not yet exist."

21   *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014).

22       Defendants acknowledge that certain raw data became available before the 2021 PBO[6]

23   was issued that was not available at the time of the 2020 PBO.  However, they also indicate that

24   FWS scientists relied upon "the newly available data to update habitat models and population

25   trends appropriately for use in [their] analyses," thus suggesting that the agency may have

26   essentially created new kinds of habitat models.  (Doc. No. 15 at ¶ 9.)  As a result, FWS contends

27

28   ───────────────
[6] At oral argument, counsel for the defendants also noted that it is the Conservation Biology
Institute, not the FWS, that is gathering this data.

1  that the lack of a new population estimate did not "prevent a reasonable assessment of the USFS

2  activities on [SSN fishers]."  (*Id.*)

3       In moving for preliminary injunctive relief, plaintiffs have not identified or described what

4  better scientific evidence existed at the time of the 2020 or 2021 PBOs that the agencies should

5  have used or replied upon.[7]  Given the lack of such a showing, plaintiffs have failed to

6  demonstrate that they have presented serious questions as to their claim based on this theory of

7  ESA liability, let alone established their likelihood of success on the merits of that claim.

8          b.  *Plaintiffs' ESA Claim Based Upon the Alleged Failure to Consider the*

9          *Minimum Viable SSN Fisher Population Size*

10       Plaintiffs' second argument is that FWS never considered the best available science with

11  respect to the minimum viable population of SSN fishers.  (Doc. Nos. 9-1 at 24; 9-3 at ¶ 19.)

12  Plaintiffs assert this was needed to avoid a significant risk of extinction and, if defendants had

13  done so, they would not have authorized any incidental fisher take.  (Doc. No. 9-1 at 24.)

14  Plaintiffs describe the Triall (2007) study that found that the minimum viable population for

15  terrestrial mammals such as the SSN fisher is 3,876 individuals.  (*Id.* at 24–25.)  Plaintiffs then

16  suggest that even "prior to the last decade of habitat loss, the SSN fisher population was already

17  between 87 and 97 percent lower than the minimum viable population," emphasizing that the loss

18  of even one breeding female in a breeding season could irreparably harm the species and threaten

19  its' ultimate survival.  (Doc. No. 9-3 at ¶ 20.)

20       Defendants reject the notion that they should have considered or determined the minimum

21  viable population needed for SSN fisher survival.  (Doc. No. 13 at 23.)  Defendants characterize

22  the findings of the Traill (2007) study upon which plaintiffs rely as generalized conclusions that

23  the study itself advised are not "universally applicable" and they note that the study did not

24  include (or synthesize data for) the SSN fisher. (Doc. No. 15 at ¶ 10.)  Defendants assert that the

25  best available scientific literature—including a study referred to as Flather et al. 2011a, 2011b—

26  instead suggests that minimum population size is not "useful for conservation planning" and that

27

28

[7]  Nor is there authority for the proposition that this court should order defendants to conduct an updated population study in order to develop scientific evidence that does not presently exist.

1    there is "no 'magic number' to assure population persistence."  (Doc. Nos. 13 at 24; 15 at ¶ 10.)

2    Instead, defendants contend that "[e]valuating the status of the species considers a more holistic

3    approach by examining the species biology and its interaction with the environment, rather than

4    only relying on outdated or often non-existent population estimates."  (Doc. No. 15 at ¶ 10.)

5    According to defendants, although the current fisher population is undoubtedly small, the

6    population had been even smaller in the past and has increased in numbers and expanded

7    geographically, which suggests some level of "population resilience."  (*Id.* at ¶¶ 11, 19.)

8    Defendants also dispute the contention that SSN fishers cannot withstand the take of twelve

9    individuals, as authorized over multiple years, in the five proposed projects where incidental take

10   has been authorized because "[i]f a breeding female is disturbed from the USFS projects to the

11   point that she foregoes a breeding season, [they] expect that individual to successfully breed in

12   future years, and that other female fisher[s] will continue to breed throughout their range."[8]  (*Id.*

13   at ¶¶ 11, 17–19.)

14        In reply, plaintiffs clarify that they do not contend there is a specific number for a

15   minimum viable population of SSN fishers, only that (1) defendants should have considered that

16   even the outdated SSN fisher population estimate is "an order of magnitude smaller than the

17   average minimum viable population size for mammals" and (2) the Flather et al. 2011a and 2011b

18   studies, which defendants reference in their opposition are in agreement with the Traill (2007)

19   study on the point that "'multiple populations totaling thousands (not hundreds) of individuals

20   will be needed to ensure long-term persistence' for populations of imperiled species."  (Doc. Nos.

21   21 at 11; 21-2 at ¶ 18.)  Plaintiffs argue that this is a procedural argument properly characterized

22   as follows:  "FWS must consider the science on minimum viable populations, and in particular

23   what that science tells us about the prospects for a mammal species with only a few hundred

24   remaining individuals, before it issues a 'no jeopardy' determination that will render that species

25   _____

26   [8]  Defendants also clarify that the incidental take statement was a "worst case scenario": in the
     event that a noise disturbance or habitat changes from the proposed projects disturb or impact the

27   breeding season of up to four adult SSN fisher females and "that it is possible that, if a mother
     abandons a den from the disturbance, up to eight kits may be injured or killed."  (Doc. Nos. 9-5 at

28   898; 15 at ¶ 18.)

1  vulnerable to additional disturbances." (*Id.* at 11.)  Plaintiffs also criticize defendants' reliance

2  upon the "stable population trend", which they assert is not a proper substitute for current

3  population estimates. (*Id.*)

4        As with their first theory of how the ESA has allegedly been violated by defendants, the

5  court concludes that plaintiffs again have failed to demonstrate they are likely to succeed on the

6  merits of their claim or even that serious questions going to the merits of the claim have been

7  raised by them.  Plaintiffs have not identified the best available data evincing what the minimum

8  viable population size of the SSN fisher is—and indeed, it appears no such data or study exists.

9  Nor have plaintiffs identified a statutory basis which requires defendants to conduct a minimum

10  population viability analysis prior to the issuance of a PBO.  Defendants have adequately

11  described why a minimum viable population estimate, such as that found in the Traill (2007)

12  study, need not be relied upon here.  This court must defer to the agency's finding of "what

13  constitutes the best scientific and commercial data available [because this] is itself a scientific

14  determination deserving of deference." *Locke*, 776 F.3d at 995.

15        Thus, for the same reasons as outlined in addressing plaintiffs' first ESA theory above, the

16  court concludes that it cannot order the government to prepare the minimum viable population

17  study that plaintiffs desire because the ESA does not require an agency to conduct new tests or

18  make decisions based on nonexistent data. *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v.*

19  *Jewell*, 747 F.3d 581, 602–04 (9th Cir. 2014) ("Absent superior data[,] occasional imperfections

20  do not violate' the ESA best available [science] standard."); *Ctr. for Biological Diversity.*, 807

21  F.3d at 1047; *Locke*, 776 F.3d at 995 ("The [best available science] standard does not, however,

22  require an agency to conduct new tests or make decisions on data that does not yet exist.").

23        c.   *Plaintiffs' ESA Claim that Defendants' Determination of the Long-Term*

24           *Benefit to Fishers is Unsupported*

25        Third, plaintiffs take issue with FWS's assertion that the "'long-term benefits' of

26  vegetation management on forest resiliency 'outweigh the short-term negative effects of

27  vegetation management' on fishers," arguing that this determination is "mere conjecture" that is

28  contradicted by alternate studies which plaintiffs contend are instead the best available scientific

1    evidence.  (Doc. No. 9-1 at 25–26.)  Plaintiffs contend that FWS "uncritically accepted" USFS's

2    view that logging projects at issue are intended to, and will increase, forest resilience and reduce

3    the risk of wildland fire.  (*Id.*)  Plaintiffs provide declarations describing how research prepared

4    after the Rim Fire in the Stanislaus National Forest suggested that areas without mechanical

5    thinning (caused by logging) had less "high-severity" fire than areas which had been thinned and

6    that comparative studies "showed that mechanically thinned areas burned more intensely than

7    prescribed burn areas."  (Doc. Nos. 9-3 at ¶ 26; 9-6 at ¶¶ 19–21.)  Specifically, plaintiffs argue

8    that in the Sierra Nevada forests at issue in this case, "an evidence-based analysis" revealed that

9    the more heavily managed land burned with higher severity in the Creek Fire.  (Doc. No. 9-3 at

10   ¶¶ 24–25.)  Plaintiffs also appear to challenge[9] the efficaciousness of "modern vegetation

11   management activities" such as those proposed in some of the thirty-one projects they have now

12   focused their motion upon and which they assert may increase fire spread and severity, despite

13   being purportedly designed to do the opposite.  (Doc. No. 9-6 at ¶¶ 13–16, 22.)

14          Related to this point, plaintiffs argue that even if the long-term benefits theory adopted by

15   defendants were permissible, defendants have still acted in violation of the edicts of the ESA.

16   This, according to plaintiffs, is because FWS must consider all relevant aspects of the issue in its

17   analysis and may not simply ignore or dismiss immediate negative impacts on SSN fishers such

18   as those defendants concede will occur as a result of the thirty-one proposed projects.  (Doc. No.

19   9-1 at 25–26.)  Plaintiffs highlight there will be harms faced by SSN fishers due to both the

20   animals' short lifespan of only approximately ten years, and the lengthy time needed for the old-

21   growth forest habitat upon which the fishers depend to develop since "the habitat lost through

22   logging and other 'fuels reduction' activities will not be replaced during a fisher's lifetime, or

23   indeed for many generations of fishers."  (*Id.* at 26) (citing *Nat'l Wildlife Fed'n*, 524 F.3d at 934

24   (quoting *Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation*, 426

25   _____

26   [9]  At the hearing on the pending motions, certified law student representing plaintiffs clarified that
     plaintiffs do not challenge USFS' wildland fire management procedures.  Rather, the only aspect
27   of the procedures related to wildland fire mitigation efforts which plaintiffs question is FWS's
     failure to make a "no jeopardy" determination as a part of its biological opinion, which turns
28   largely on FWS's theory that logging will help SSN fishers in the long-run by reducing fire risk.

1    F.3d 1082, 1094 (9th Cir. 2005)) (agencies "'must consider near-term habitat loss to populations

2    with short life cycles.'")  Plaintiffs also aver that the 2021 PBO "continues to ignore or understate

3    the impact of post-fire logging by inaccurately assuming zero impacts to fishers from the logging,

4    contrary to the best available science, which concludes that burned areas are often selected by

5    fishers for foraging in the absence of logging and that logging removes such habitat."  (Doc. No.

6    1 at ¶ 76.)

7            In response, defendants assert plaintiffs' argument in this regard is based upon plaintiffs'

8    mere speculation with respect to the "large body of science" that the agencies considered.  (Doc.

9    No. 13 at 25–26.)  According to defendants, the agencies recognized that high-severity fires pose

10   a risk to SSN fisher survival, but the agencies specifically designed many of the proposed projects

11   to reduce the risk in suitable SSN fisher habitat areas.  (*Id.*)  Defendants further assert *inter alia*

12   that plaintiffs' studies describing an increased risk of high-severity fires post-logging relate to

13   much larger blocks of land and not all of the science cited by plaintiffs is applicable to the types

14   of projects challenged by the pending motion.  (*Id.* at 26.)  Defendants characterize the parties'

15   relative positions as placing a "disagreement" before the court as to the best science and they

16   argue that the agencies' professional judgment should be upheld in light of the nature of that

17   disagreement.  (*Id.* at 27.)

18           In reply, plaintiffs contend that defendants have mischaracterized this as a dispute about

19   how to best protect the SSN fisher.  (Doc. No. 21 at 5.)  Instead, plaintiffs characterize the issue

20   before the court as follows:  the agencies' decision not to explain that how the long-term benefit

21   of fire resilience will outweigh the short-term adverse impact of the thirty-one projects is arbitrary

22   and capricious because there must be a "rational connection" between the facts and the agencies'

23   decision.  (*Id*. at 13.)

24           On this point, the court concludes that plaintiffs' argument at this point is an

25   impermissible post-hoc critique of the agencies' decision-making with regard to their 'fire safety

26   and prevention efforts.  As noted above, a court's review of agency compliance with the APA is

27   highly deferential.  *McNair*, 537 F.3d at 993 (citing 5 U.S.C. § 706(2)(A)).  As the Ninth Circuit

28   has cautioned:

1
2
3
4

> This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise. [citations omitted.].  As part of this deference, we afford the agency discretion to choose among scientific models; we "reject an agency's choice of a scientific model only when the model bears no rational relationship to the characteristics of the data to which it is applied."

5   *Locke*, 776 F.3d at 994 (quoting *San Luis & Delta-Mendota Water Auth*., 747 F.3d at 621).  As

6   defendants note, some of the evidence relied upon by plaintiffs to their alternate fire prevention

7   findings was considered by FWS because plaintiffs submitted letters to the agency reflecting that

8   evidence while FWS was preparing the 2021 PBO.  (Doc. No. 22-1 at 2.)  Specifically,

9   defendants point to  the March 10, 2021 letter written by Dr. Joseph Werne and the March 10,

10  2021 letter written by Dr. Chad Hanson, both of which are attached as exhibits to the Second

11  Voss Declaration, (Doc. No. 21-1).  FWS states that when they received plaintiffs' letters, the

12  draft 2021 PBO had been prepared and was in the process of being reviewed, but FWS paused the

13  review to consider both of letters.  (Doc. No. 22-1 at ¶ 2.)  Although FWS considered that

14  evidence, it ultimately determined it to be appropriate to rely 'on science that FWS found to be  a

15  better fit the situations at hand, as described in the following excerpt from a March 12, 2021

16  memorandum prepared by Supervisory FWS Biologist Richard Kuyper :

17
18
19

- *The letter* [from plaintiffs] *states that "However, statistical studies find that past vegetation treatments have tended to increase, not decrease, subsequent fire frequency and severity (e.g., Donato et al. 2006; Thompson et al, 2007; Cruz et. al. 2014, Bradley et. al. 2016, Zald and Dunn 2018).*

20
21
22
23
24
25
26
27

  - There is a variety of responses to a variety of types of vegetation treatments in different forests and landscape contexts.  The statement in the letter make a vast overgeneralization and the studies referenced are not wholly applicable.  For example, Zald and Dunn 2018 was on private lands and is an inappropriate comparison.  **The USFS Response provides details on this.**  Bradley et al. 2016 conducted a broadscale analysis of "protected" forests and fire severity over several decades and did not analyze specific types of vegetation treatments.  Donato et al. 2006 considered a single case study regarding post-fire treatments and reburn.  Thompson et al. 2007 considered the same case study and again was examining post-fire treatments.  Cruz et al. 2014 was discussing caution in how to use particular modeling characteristics in fire analysis.  Even a quick glance at the abstracts for these cited studies do not support broadly generalizing "past vegetation treatments have tended to increase, not decrease, subsequent fire frequency and severity."

28  /////

- *The letter* [from plaintiffs] *states "In a study published in January of 2021, (which was sponsored primarily by USFS) Atchley et al. demonstrated that modern vegetation treatments proposed in USFS General Technical Reports (PSW-GTR-220 and PSW-GTR-237) can result in increased fire spread, despite being designed to do the opposite."*

  - From the abstract of Atchley et al., "Results showed that with increased fuel density fidelity and heterogeneity, fire spread and area burned decreased owing to a combination of fuel discontinuities and increased fine-scale turbulent wind structures that blocked forward fire spread. However, at large characteristic length scales of spatial fuel density, the fire spread and area burned increased because local fuel discontinuity decreased, and wind entrainment into the forest canopy maintained near-surface wind speeds that drove forward fire spread. These results demonstrate the importance of incorporating high-resolution fuel fidelity and heterogeneity information to capture effective wind conditions that improve fire behaviour forecasts." This does not appear to be at odds with USFS management intentions.

  - Also, this paper was based on a ponderosa pine forest near Flagstaff, AZ, which is a very different forest type from the mixed conifer forests in the Sierra Nevada. This brings added nuance to referencing this paper since "ladder fuels" can be very different in a forest dominated by pine versus a forest composed of multiple species (i.e., firs are more numerous and tend to dominate the ladder fuels in Sierra Nevada). An analysis like this with data from the Sierra Nevada would be informative, but this one paper cannot be used to dismiss all the previous science from the Sierra Nevada mixed conifer forest.

(*Id.* at 5–6.) The 2020 PBO also addresses the specific tradeoffs and analyzes the potential short-term negative effects to the SSN fisher. (*See, e.g.,* Doc. No. 9-5 at 856–57, 862–68, 895.) It therefore appears from the record currently before the court that the agencies did adequately consider the concerns that plaintiffs now raise. Thus, plaintiffs' claim that defendants' determination of the long-term benefit of the challenged projects to the fishers is unsupported appears to be a mere disagreement regarding the most relevant science. This is a matter as to which this court must defer to the agencies' reasoned resolution of the issues. *Marsh*, 490 U.S. at 378.

Accordingly, the court finds that plaintiffs have failed to show that they are likely to prevail on the merits of this aspect of their ESA claim or even that they have raised "serious questions" as to that likelihood.

/////

/////

27

1          D.    *ESA Claim Challenging the 2021 PBO's "No Jeopardy" Determination*

2          Finally, plaintiffs argue that the approach FWS took in determining there would be "no

3   jeopardy" to the SSN fishers as a result of the challenged projects was an "incremental

4   comparative approach" which the Ninth Circuit has found to be impermissible.  (Doc. No. 9-1 at

5   27.)  Specifically, plaintiffs contend that "FWS has not done any analysis by which it could

6   reasonably conclude that disruptive management activities across thousands of acres of fisher

7   habitat each year will have only negligible incremental impacts." (*Id.*)

8          In response, defendants argue that plaintiffs mischaracterize the cases upon which they

9   rely as well as the facts relating to the nature of the thirty-one proposed projects.  (Doc. No. 13 at

10  27.)  Defendants further argue that the agencies' approach to evaluating the impact of their

11  proposed projects on the SSN fisher complies with the ESA because there are no outside threats

12  that plaintiffs can point to that the agencies did not consider, as was the situation in the cases

13  upon which plaintiffs rely.  (*Id.*)  According to defendants, plaintiffs' argument disregards all the

14  long-term benefits the proposed projects will have for the species and ignores all of the tracking

15  and monitoring requirements imposed by the 2021 PBO.  (*Id.* at 28.)  On that latter issue,

16  defendants assert that USFS "must provide annual updates on the status of projects impacting

17  fisher as well as cumulative reports every five years that cover not only project status, but the

18  status of fisher habitat, the type and amount of activities in fisher habitat, and information

19  obtained from the fisher monitoring program, which will allow the agencies to closely evaluate

20  the impacts of forest management on fisher."  (*Id.*)

21         In reply, plaintiffs urge the court not to attempt to resolve this "battle of the experts" and

22  instead set aside the findings of "no jeopardy" and remand the case to the agencies for further and

23  appropriate consideration and analysis.  (*Id.* at 12.)

24         Plaintiffs cast this dispute as a procedural failure by defendants.  However, as to this

25  aspect of their ESA claim a well, the court concludes plaintiffs are actually asking the court to

26  substitute their opinions on fire safety efforts and how those efforts might impact the fisher

27  habitat in the long-term for the agencies' analysis of that question.  The court is unable to do so.

28  As the Ninth Circuit has stated, "[t]he [agency's] action . . . need only be a reasonable, not the

1   best or most reasonable, decision." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070

2   (9th Cir. 2010). (quotation and citations omitted); *see also Center for Biological Diversity v.*

3   *Esper*, 958 F.3d 895, 907 (9th Cir. 2020).  The court is unable "to make its own judgment,"

4   because "Congress has delegated that responsibility to the [agency]." *Martin*, 593 F.3d at 1070.

5   "The court's responsibility is narrower:  to determine whether the [agency's action] comports

6   with the requirements of the APA . . .." *Id.*

7        Accordingly, the court concludes that in seeking preliminary injunctive relief plaintiffs

8   have failed to demonstrate their likelihood of success on the merits of this aspect of their ESA

9   claim or even shown that they have raised "serious questions" as to that likelihood.

10                 a.     *Plaintiffs' NEPA Claim Against USFS*

11        Plaintiffs next contend that they are likely to prevail on their NEPA claim against the

12  USFS because the agency failed to supplement its "abbreviated" environmental reviews

13  permitting the thirty-one projects upon which plaintiffs have focused in light of changes in

14  environmental conditions and circumstances to the landscape in violation of 40 C.F.R.

15  § 1502.9(d)(1)(ii).  (Doc. No. 9-1 at 28–30.)  Plaintiffs also argue that the USFS has failed to

16  perform "cumulative impacts analysis," evaluating the "cumulative effects of past, present, and

17  reasonably foreseeable future projects on the SSN fisher."  (*Id.* at 30.)  Plaintiffs argue that

18  (1) this supplemental analysis should have provided an accurate assessment of the baseline status

19  of the SSN fisher and its habitat, so that the agency could properly evaluate impacts to resources

20  and (2) it was necessary for the agencies to evaluate the cumulative impacts of habitat loss and

21  fragmentation of the landscape when multiple projects, such as those challenged here, will affect

22  the same forests.  (*Id.*)

23        Plaintiffs contend that the USFS has not fulfilled its obligations under NEPA because the

24  thirty-one challenged projects were approved by the 2020 PBO primarily through the

25  employment of categorical exclusions[10] or short environmental assessments ("EAs") rather than

26  _____

27  [10] "By definition, [categorical exclusions] are categories of actions that have been predetermined
    not to involve significant environmental impacts, and therefore require no further agency analysis
    absent extraordinary circumstances."  *Nat'l Trust for Historic Preservation v. Dole*, 828 F.2d 776,

28  781 (D.C.Cir.1987); *see also Elliott*, 290 F. Supp. 3d at 1113–14 (Categorical exclusions "are

                                          29

1    through preparation of an EIS.  (*Id.* at 29.)  Plaintiffs also argue that a supplemental "landscape-

2    level" review was required because of several significant changes after those projects were

3    approved:  (1) the SSN fisher was listed as endangered, which conferred new legal protections on

4    the species; and (2) two substantial wildfires devastated the Sierra Nevada landscape.  (Doc. No.

5    9-1 at 30.)  Plaintiffs further claim that only a modest showing of "substantial questions"—that

6    the new circumstance could change a project's impact—trigger the requirement for a

7    supplemental environmental review.  (*Id.* at 28.)

8          Defendants respond that there is no duty to conduct a cumulative impacts analysis or a

9    supplemental environmental review on a "landscape level."  (Doc. No. 13 at 28.)  They contend

10   that NEPA only requires a duty to supplement ongoing, project-specific actions on a "project

11   level."  (*Id.*)  According to defendants, "[t]he [USFS]'s NEPA regulations allow the Agency to

12   analyze and authorize a project-level decision in an EIS and Record of Decision, an EA and

13   Finding of No Significant Impact [], or a categorical exclusion."  (*Id.*)  Defendants assert that

14   plaintiffs are essentially seeking an intermediate level of review, between the "project level" and

15   the "forest level," which is not required or even contemplated by federal regulations.  (*Id.* at 28–

16   29.)  Defendants argue that because the proposed projects at issue here are not part of a regional

17   plan, there is no need for a regional NEPA analysis.  (*Id.* at 29.)  Defendants also contend that in

18   their complaint plaintiffs have not challenged the specific project decisions, let alone assert in any

19   way how those project specific decisions are arbitrary and capricious.  (*Id.* at 30.)

20         In reply, plaintiffs take the position that when several EAs will have cumulative effects on

21   a resource, those effects must be considered in a single NEPA analysis, carried out by way of an

22   EIS.  (Doc. No. 21 at 15.)  They argue that here defendants have conceded that no cumulative

23   impact analysis has been conducted.  (*Id.* at 15–16.)  Plaintiffs contend that for this reason, a

24   supplemental EIS or a forest plan amendment to the 2004 Framework must be conducted before

25

26   certain defined categories of activities that an agency, like USFS, has determined through prior
     evaluation and regulatory action to be exempt from the requirement that the agency prepare EAs
27   or EISs.")  "USFS has promulgated numerous [categorical exclusions] for its forestry and land
     management activities."  *Elliott*, 290 F. Supp. 3d at 1113–14.  There are also statutory categorical
28   exclusions created by Congress.

1   the challenged projects are permitted to move forward.  (*Id.* at 17, 19.)  Plaintiffs assert that "the

2   NEPA analysis the Forest Service now relies on for its project-level review was initially

3   conducted many years before the May 2020 SSN fisher listing decision, the subsequent 2020

4   wildfires, and even the previous drought."  (*Id.* at 18.)

5           Plaintiffs' challenge to all thirty-one projects as a group has made the court's review of

6   this claim particularly difficult.[11]  In the end, the court concludes that this lack of specificity with

7   respect to plaintiffs' showing is fatal to their pending motion.  In this regard, the court observes

8   plaintiffs' complaint asserts that a cumulative effects analysis is required, but do not specify what

9   document(s) they seek to have revised.  Moreover, the regulation cited by plaintiffs in support for

10  this kind of supplemental "landscape-level" review, 40 C.F.R. § 1502.9(d)(1)(ii), by its own terms

11  relates only to a duty to supplement an *EIS*.  As to the thirty-one proposed projects they

12  challenge, plaintiffs assert that approval was obtained by way of categorical exclusions or EAs,

13  rather than an EIS.  (Doc. No. 9-1 at 29.)  However, plaintiffs' argument for a supplemental EIS

14  as to those projects approved by a categorical exclusion cannot be considered because plaintiffs'

15  complaint does not even challenge the agency's decision that any of the projects falls into a

16  categorical exclusion.  Notably, at the hearing on the pending motions defendants' counsel

17  represented that five of the thirty-one challenged projects were in fact approved by way of EIS:

18  Exchequer Restoration Project, Fish Camp,  Grey's Mountain, Sugar Pine Adaptive Management,

19  and Whiskey Ridge Ecological Restoration Project.  However, plaintiffs have not addressed why

---

20  [11]  Indeed, as plaintiffs concede in their complaint, some of the thirty-one projects are currently

21  undergoing supplemental review or are presently being considered for supplemental review at this
    time:

22

23          While the NEPA documentation for some of these projects has been
            updated to reflect new information or changed circumstances,
24          Plaintiffs are informed and believe, and on that basis allege, that
            USFS has not undertaken supplemental NEPA review for all or
            most of these projects to evaluate the nearly 55 percent reduction of
25          SSN fisher suitable habitat on the national forests over the last
            decade, and the unquantified (by USFS or FWS) loss and
26          degradation of fisher habitat due to logging of snags in drought-
            affected and fire-affected areas.

27

28  (Doc. No. 1 at ¶ 96.)  Plaintiffs have not attempted to parse out which of those projects are not
    ripe for this court's review as a result.

1   those projects should be the subject of a supplemental EIS.

2           Plaintiffs' other specific argument, raised for the first time in reply their reply in support

3   of the pending motion, is that this 2004 Framework is the "landscape-level" EIS they seek to have

4   supplemented and which, they contend, covers all the projects at issue in this case.  (Doc. No. 21

5   at 7, 16–17.)  However, as defendants point out, not all of the thirty-one challenged proposed

6   projects are subject to that plan.[12]  Thus, plaintiffs are unable to distinguish the clear Supreme

7   Court precedent holding that a court cannot require a regionwide or landscape-level impact

8   statement where there is no regional plan governing all of the projects at issue.  *Kleppe v. Sierra*

9   *Club*, 427 U.S. 390, 400–02 (1976); *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 780 (9th

10  Cir. 2019) (holding "that the designation of landscape-scale areas [] does not trigger a NEPA

11  analysis."); *Churchill Cty. v. Norton*, 276 F.3d 1060, 1075 (9th Cir. 2001), *opinion amended on*

12  *denial of reh'g*, 282 F.3d 1055 (9th Cir. 2002) ("NEPA did not require a regional EIS in the

13  absence of a proposal for action of regional scope.").  In *Kleppe*, the Supreme Court barred

14  environmental groups seeking preparation of a comprehensive EIS for federal coal reserves in the

15  Northern Great Plains region because "there [was] no evidence in the record of an action or a

16  proposal for an action of regional scope."  (*Kleppe*, 427 U.S. at 400–01.)  The Court also held that

17  absent a such a regional plan, which "would [have] define[d] fairly precisely the scope and limits

18  of the proposed development of the region," it would not have been possible to analyze "the

19  environmental consequences and the resource commitments" in order to produce "an

20  environmental impact statement of the type envisioned by NEPA."  (*Id.*)  Furthermore, even if

21  plaintiffs here would suggest that the challenged projects are so connected as to require the

22  /////

23  /////

24  /////

25  /////

26

27  [12]  For instance, the "Revised Frog Project (Frog II Project)" is within the Giant Sequoia National
    Monument, and is thus governed by the Giant Sequoia National Monument Plan.  (Doc. No. 14 at
28  8 n.1.)

agency's consideration in a single EIS, they have failed to present any such argument or authority in support of such a contention.[13]

Accordingly, the court concludes that plaintiffs have failed to make the required showing of their likelihood of success on the merits of their NEPA claim against defendant USFS or to even show that they have raised "serious questions" as to that likelihood.

Because plaintiffs have not made the required showing as to the merits of their claim at this time, a preliminary injunction cannot issue. *All. for the Wild Rockies*, 632 F.3d at 1135 (describing that after *Winter*, plaintiffs must make a showing on all four prongs of the preliminary injunction analysis.)  In light of this conclusion, the court need not address plaintiffs' showing with respect to irreparable harm, the balance of equities, and whether the granting of an injunction is in the public interest. *See Smith v. Henderson*, 944 F. Supp.2d 89, 96 (D.D.C. 2013) ("[U]pon finding that a plaintiff has failed to show a likelihood of success on the merits, the Court may deny a motion for preliminary injunction without analyzing the remaining factors.")

/////

/////

/////

/////

/////

---

[13]  As another judge of this court has observed:

> Where an EIS is required, the Ninth Circuit applies "an 'independent utility' test to determine whether multiple actions are so connected as to mandate consideration in a single EIS.  The crux of the test is whether 'each of two projects would have taken place with or without the other and thus had independent utility.'" *California ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of the Interior*, 767 F.3d 781, 795 (9th Cir. 2014).  A plaintiff must show that an agency's decision not to prepare a single EIS was an arbitrary action. *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.").

*Elliott*, 290 F. Supp. 3d at 1123.

**CONCLUSION**

For all of the reasons set forth above:

1.      Plaintiffs' motion for a preliminary injunction (Doc. No. 9) is denied without prejudice[14]; and

2.      Defendants' motion to strike (Doc. No. 17) is denied.

IT IS SO ORDERED.

Dated:   **May 28, 2021**

_____
UNITED STATES DISTRICT JUDGE

---

[14]  The court notes that its findings in this order are limited to the context of this motion for preliminary injunction and may be revisited based upon later briefing on the merits and upon further review and consideration of the complete administrative record.

34